IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **4:22CR3073** |
| vs. | **FINDINGS, RECOMMENDATION, AND ORDER** |
| GARY GRAHAM, | |
| Defendant. | |

Defendant Graham has moved to suppress all evidence collected during the execution of a search and seizure warrant on February 5, 2021, (Filing No. 135), and the statements he made in response to custodial interrogation on February 8, 2021. (Filing No. 133). He further moves to dismiss Count II of the Indictment, claiming that prohibiting felons from possessing firearms and ammunition violates the Second Amendment, and 18 U.S.C. § 922(g)(1) is therefore unconstitutional on its face and as applied. (Filing No. 160). For the reasons explained below, the motions should be denied.

Motions to Suppress
(Filing Nos. 133 and 135)

After reviewing the evidence presented, and observing the witnesses as they testified, the court finds the following facts are credible.

In approximately early 2019, law enforcement initiated an investigation to determine whether Defendant Graham was selling methamphetamine. Officers for the Nebraska State Patrol (NSP), Nebraska City Police, and Otoe County Sheriff Department were involved in the investigation.

Reciting the investigating officers' collective knowledge, NSP Investigator Justin Parsons prepared an application for a warrant to search Defendant's residence. The warrant application requested authority to search:

> 705 11th Corso Nebraska City, Otoe County, Nebraska 68410, with a legal description of: Lots One (1) and Two (2), Block Twelve (12), Anderson's Addition to Nebraska City, Otoe County, Nebraska according to the Otoe County Register of Deeds, including the residence thereon, the garage, any and all outbuildings, storage containers or other structures, and vehicles.

(Filing No. 144-9, at CM/ECF p. 9). Investigator Parsons obtained the legal description for Graham's property from the website of the County Assessor for Otoe County. Investigator Parsons did not review plat maps or Graham's deed, and he did not consult with the county surveyor or any zoning experts, to ascertain the precise boundary lines for Graham's property.

On February 4, 2021, the application was presented to a county court judge for Otoe County, who issued the warrant that day. The warrant ordered the officers to search the property as described in the application for any property used or intended to be used to violate any law of the State of Nebraska, specifically to include:

> Any and all controlled substances, including but not limited to methamphetamine, drug paraphernalia items commonly used for the ingestion of controlled substances, drug paraphernalia items commonly used for the manufacture, preparation, and distribution of controlled substances including, but not limited to scales, plastic bags, film canisters, tin foil, or other packaging containers such as vials, baggies, and plastic wrap; any documentary evidence relating to the source of the controlled substances including, but not limited to customer lists, account sheets, ledgers, notes, or diaries; receipts; maps; any cellular telephone or electronic device that may reasonably contain information relevant to narcotics use and sales; any proceeds directly attributable to the sale of controlled

substances including, but not limited to United States currency, bank account information, property, or other financial records, evidence of occupancy or ownership of the searched property;

all firearms, ammunition, containers or firearms related accessories and documentation relating to the ownership or purchase of any firearms.

(Filing No. 144-10).

Defendant's residence was a single-story, single-family house located on two adjoining lots on the corner of 11th Corso and South 7th Streets in Nebraska City. The property was not fenced. There were no public sidewalks on the street-side boundaries of the property. Under the law, Nebraska City owned a 33-foot right-of-way for South 7th Street, (Neb. Rev. Stat. § 39-1302), but there were no signs to indicate that any or what portion of Graham's two residential lots was publicly owned.

Based on their investigation, the law enforcement officers believed Defendant possessed firearms in his residence. So, they decided to conduct surveillance and delay executing the warrant until Graham left the house. The officers began watching the home on the morning of February 5, 2021, but as of the late afternoon, Graham had not exited his residence. Law enforcement deployed an NSP S.W.A.T. team to approach the home and secure it. The S.W.A.T. team had difficulty forcing the front door open. Windows were broken while gaining access to the interior of the home.[1] Graham and co-defendant Jamie McGinnis were arrested at 4:15 p.m. and transported to the Otoe County jail. The house was deemed clear and safe to search at 4:29 p.m.

---

[1]     The officers affixed plywood over the broken windows after completing the search and before leaving the property.

The search began. Vehicles, trailers, and equipment were strewn across the yard of both residential lots, including adjacent to the curb along the streets.



Filing No. 144-11). See also Ex. 20, (search video). A blue Chevy was parked on the South 7th Street roadway, and a black Chevy pickup was parked off the street, on the yard, and a couple feet from the curb. Graham was the registered owner of both vehicles. (Filing No. 144-7, Ex. 7, Nebraska DMV Query – black pickup). The city had scraped snow off the street where the blue pickup was located. It did not remove snow from the area of the yard where Graham's black pickup was parked. (Filing No. 144-6).

Several dogs were located on the property, including a large, male German Shepard named King. At the outset of the search, this dog was chained to a tree next to the garage and within reach of the black pickup. King was known to exhibit aggressive guard behavior, lunging at the chain if someone came close to or within the chain length. King consistently barked during the search and a few hours after it began, King escaped his collar and began roaming the property. King then left the property, but he returned later. When Investigator

Parsons began searching the black pickup, King lunged toward Parsons. Believing King was attacking him, the investigator reached for his duty pistol and firing from his hip, shot King. (See Filing No. 144-8). King was promptly transported to a veterinarian but was later euthanized due to his injuries.

Otoe Deputy Sheriff Brian Briley had known Graham for many years, and they had a friendly and cordial relationship. Briley knew Graham loved his dogs. Briley therefore went to the jail and notified Graham that King was shot. Briley also notified Graham that windows in Graham's house were broken and the water to the home was shut off. The jail staff allowed Graham to contact others to care for his home and the remaining dogs on the property.

During the search NSP Investigator Henry Dimitroff searched the black pickup and in the engine compartment and found a rifle and ammunition. (Filing Nos. 144-12 through 144-15).

At 10:00 a.m. on February 8, 2021, Investigator Parsons and Deputy Briley contacted Graham at the Otoe County jail. Graham was escorted to an interview room and was seated with the officers. Graham was advised of his Miranda rights, and stated he was willing to answer the officers' questions. (Ex. 17, video file, at 2:15-2:55).

Graham is an adult with an extensive criminal history and prior experience with law enforcement and the criminal justice system. He was not handcuffed while in the interview room. No promises or threats were made to induce Graham's consent to interrogation. Graham did not appear distraught over the death of his dog, and during the interview, neither the officers nor Graham mentioned that King was shot. Graham appeared coherent, able to understand

the officers' questions, and not under the influence of drugs or alcohol. He answered most of the questions, and those answers were responsive to the questions asked. He refused to answer some questions, particularly when asked to identify his drug supplier. The interview lasted about an hour. Graham did not ask the officers to end the interview, and while he mentioned needing funds to hire a lawyer, did not specifically request a lawyer during the interview.

Cell phones were seized during the search of the home, but they were not immediately searched. During the interview on February 8, 2021, Graham identified his cell phone by description. (Ex. 17, at 26:40-27:40). Near the close of the interview, and after Graham had refused to identify his supplier in response to questioning, the officers asked for consent to search the cell phone. Without hesitation, Graham consented both verbally and in writing the search of his phone. (Ex. 17, at 42:20-44:55; Filing No. 144-18). No promises or threats were made to secure Graham's consent to search the cell phone. The consent appeared knowing and voluntary.

At the close of the interview, Graham shook hands with the officers and agreed that they could return if needed to ask additional questions. (Ex. 17, at 53:50-54:00). After that day, Graham provided information to assist law enforcement.

In 1999, Graham was convicted on charges of committing a serious drug felony. See U.S. v. Graham, 8:98-cr-00235-RGK (D. Neb). He received a 120-month prison sentence. His term of imprisonment was completed on July 31, 2007. (Filing No. 21).

An indictment against Graham was filed in the above-captioned case on June 14, 2022. Count I alleges Graham engaged in illegal drug trafficking from December 1, 2018 to on or about June 13, 2022. Count II alleges that on February 5, 2021, Graham had a felony record and possessed a Remington 522 Viper .22 caliber rifle and ammunition which had been shipped and transported in interstate commerce. (Filing No. 1).

ANALYSIS

Graham argues the warrant issued on February 4, 2021 did not lawfully authorize the search of his property because the warrant application lacked a sufficient showing of probable cause; the officers' search and seizure on February 5, 2021 pursuant to the warrant violated the Fourth Amendment; his custodial interrogation on February 8, 2021 was involuntary and violated the Fifth Amendment; and the information obtained from the warrantless search of his cell phone must be suppressed under the Fourth Amendment because his consent to that search was involuntary.[2] (Filing Nos. 133 & 135). Graham also moves to dismiss Count II of the indictment which charges him with being a felon in

---

[2]    Graham's brief also states the property search violated his "fifth, sixth, and fourteenth amendment rights guaranteed by the United States Constitution, and Article 1 § 7 of the Nebraska Constitution." (Filing No. 136, at CM/ECF p. 2). Graham's brief includes no argument addressing his claim under the Nebraska Constitution, or his Fifth, Sixth, and Fourteenth amendment claims. The court may therefore deem those claims abandoned.

In addition, the court notes that the Fifth amendment secures the right to counsel during questioning, and it is not applicable to claims regarding the alleged unlawful search and seizure of property prior to any custodial interrogation. There is nothing indicating Graham invoked his right to counsel at any time before or during the search, so the Sixth amendment is not implicated. There is no case law supporting suppression of evidence arising from an alleged Fourteenth amendment violation. And since this case is filed in federal court, the question is whether suppression is warranted under the Fourth Amendment, not the Nebraska Constitution. California v. Greenwood, 486 U.S. 35, 35 (1988).

possession of a firearm, arguing 18 U.S.C. § 922(g)(1) violates the Second Amendment on its face and as applied. (Filing No. 160).

I.    The Warrant Application and Warrant

Graham argues the search warrant application lacked a sufficient showing of probable cause, included illegally obtained information, and did not support a warrant to search his residence or to seize his cell phone. When presented with a warrant application, the court must conduct a "'practical, common sense inquiry,' consider 'the totality of the circumstances set forth,' and determine if, based on the information within the four corners of the application, there exists a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" U.S. v. Stevens, 530 F.3d 714, 718 (8th Cir. 2008) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). The reliability of statements within the application can be corroborated and supplemented by independent police investigation, (United States v. Warner, 894 F.2d 957, 959 (8th Cir. 1990)), and informants may be considered reliable if their separately obtained statements provide substantially the same information. United States v. Jackson, 898 F.2d 79, 81 (8th Cir. 1990) (citing Warner, 894 F.2d at 960).

Here, Investigator Parsons' warrant application included statements from four informants, each identifying Graham as a drug dealer. Informants 1, 2, and 4 also identified Graham's property as a location where drug sales occurred. While the application states informants 1, 2, and 3 were "of unknown reliability," each of their statements were cross-corroborated by the statements of the others. Informant 4 provided highly detailed information. Using publicly available information, their past knowledge of Graham and his property, and their own observations, investigating officers were able to confirm information provided by

Informant 4, and the description of Graham's residential property provided by Informants 1, 2, and 4. The application further explained Graham's involvement in three controlled buys that occurred on the residential lots he owned in Nebraska City, Nebraska. Considered in the totality, the facts within the warrant application clearly supported a finding of probable cause to believe evidence of illegal drug conduct could be found during a search of Graham's residential property.

Graham argues the warrant to search his home was invalid because the application included facts describing controlled buys conducted there. Graham argues:

> [P]olice equipped a confidential informant with recording devices and sent the informant into the Defendant's home to record "controlled buys", and they did so without a warrant. Law enforcement subsequently used that information in an affidavit to support the application for the search warrant in this case. The recording of conversations in the Defendant's home is a violation of the Defendant's constitutional rights, and any evidence flowing from that violation should be suppressed as fruit of the poisonous tree.

(Filing No. 135, at CM/ECF p. 2).

"[I]t is well-established in Fourth Amendment jurisprudence that a person engaged in a conversation assumes the risk that another party to the conversation might choose to divulge or even record the conversation." United States v. May, 70 F.4th 1064, 1075 (8th Cir. 2023), reh'g denied, No. 21-3075, 2023 WL 5093510 (8th Cir. Aug. 9, 2023). A defendant who allows an informant to enter his home to conduct a drug sale lacks a reasonable expectation of privacy in the content of any communications occurring during that transaction. The Fourth Amendment is not violated when an informant secretly records a drug

transaction which the defendant knowingly and voluntarily performed within his home. Id.

Moreover, when a defendant claims a warrant affidavit contains information obtained in violation of the Fourth Amendment, the reviewing court must redact that information and then evaluate whether the remainder establishes probable cause. United States v. Brooks, 22 F.4th 773, 778 (8th Cir.), cert. denied, 142 S. Ct. 2826, 213 L. Ed. 2d 1045 (2022). Here, even after striking all facts discussing controlled buys, the application to search Defendant's property still includes the information provided by four separate informants. These cross-corroborated statements were consistent with the officers' own knowledge of Graham and his property, their independent investigation, and the statements of a local citizen. Excluding the controlled buys from the application, the remaining facts still identify Graham's residential property as a situs of illegal drug sales.

When a warrant application contains illegally obtained evidence, but upon removal of that information, the application still supports a finding of probable cause, evidence obtained when the warrant is executed will not be suppressed. Id.; United States v. O'Neal, 17 F.3d 239, 244 (8th Cir. 1994). An illegal entry does not invalidate a subsequent search warrant if a showing of probable cause exists after the illegally obtained information is stricken. U.S. v. Packer, 730 F.2d 1151, 1156 (8th Cir. 1984).

Graham argues the warrant application lacked any facts justifying the seizure of his cell phone. Graham's motion states:

[T]he search warrant contains no information that cell phones were utilized in a criminal fashion, nor does the warrant explain how cell

phones or information therein would be relevant to the criminal investigation. There is no nexus between the information provided in the search warrant affidavit and any cell phones, and therefore the seizure of cell phones, and subsequent searches therein should be suppressed and excluded.

(Filing No. 135).

Judges use common sense when reviewing warrant applications. Some facts need not be spelled out. "It would be unreasonable and impractical to demand that judges evaluating probable cause must turn a blind eye to the virtual certainty that drug dealers use cell phones." United States v. Eggerson, 999 F.3d 1121, 1127 (8th Cir. 2021).

Finally, under the good-faith exception to the exclusionary rule, evidence seized during the execution of a search warrant will not be suppressed if the executing officers' reliance upon the warrant was objectively reasonable. United States v. Leon, 468 U.S. 897, 916 (1984). When a search is conducted pursuant to a warrant, the good-faith exception applies unless 1) the judge issuing the warrant was misled by an affiant's false or concealed material statements; 2) the issuing judge wholly abandoned his or her judicial role; 3) the affidavit is so lacking in indicia of probable cause that official belief in its existence was entirely unreasonable; or 4) the warrant was so facially deficient that the officers could not reasonably presume it to be valid. Id. at 923.

Here, none of the exceptions to Leon have been either raised or argued. The warrant authorized the search of Graham's residential property, and it ordered the officers to seize "any cellular telephone or electronic device that may reasonably contain information relevant to narcotics use and sales." (Filing No. 10). Under Leon, the officers were entitled to rely on the warrant and the commands within it as granting authority to search the property described and

11

seize of Graham's cell phone. There is no basis for suppressing the evidence seized during the February 5, 2021 search due to an alleged insufficient warrant application.

II.    Execution of the Warrant

Graham argues the officers' search of the black pickup exceeded the scope permitted under the warrant because the pickup was not parked on the property legally described in the warrant.

Apparently, the black pickup was parked on the snow-covered yard but within the city's 33-foot right of way for the street. Graham claims the pickup was therefore not within the county accessor's legal description of his property—the property description used in the warrant application and warrant. See Filing No. 144-6, Ex. 6.



Graham's vehicle- Black Chevy pickup- Nebraska license plate 11-618H. Graham's firearm was located under the hood of the black chevy pickup.



Even if the court assumes the black pickup was not parked within Graham's lot lines, "suppression is not an automatic consequence of a Fourth Amendment violation. Instead, the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." Herring v. United States, 555 U.S. 135, 137 (2009). The validity of the search of Graham's black pickup turns on whether their belief that it was located on Graham's property was objectively understandable and reasonable. Maryland v. Garrison, 480 U.S. 79, 88 (1987). If the officers' conduct was based on a reasonable but mistaken belief that the pickup was within the scope of the authorized search, the evidence found in the pickup should not be suppressed. Garrison, 480 U.S. at 88.

Here, Deputy Briley, who if very familiar with Nebraska City, and Graham's property in particular, believed the pickup was parked on Graham's property. The city did not mow or shovel snow from the yard area where the pickup was parked, did not add a sidewalk to that area, and placed no signage to delineate the boundary. For extended periods of time, Graham had items of property located or parked on the publicly owned yard area surrounding his lots. Yet, the city did not remove the property. Graham used the property as if he owned it, and from all outward appearances, he did. Graham claims that rather than assume he owned the land he was using, the officers should have investigated further by reviewing land surveys and/or deeds and consulting with county or city officials. The court disagrees.

"[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." Garrison, 480 U.S. at 87. Where all outward evidence indicated Graham owned the property to the curb, the officers were reasonable in believing Graham was the owner and that the legal description on the county assessor's website described Graham's real estate lots as bounded

by the curbs of the adjacent streets. U.S. v. Patterson, 278 F.3d 315 (4th Cir. 2002) (holding agents executing a warrant to search property at a defendant's address were reasonable and did not violate the Fourth Amendment when they searched defendant's car parked on gravel area between Defendant's house and the street, even though a survey later showed the area was not within Defendant's lot lines, and the car itself was not specifically listed in the warrant).

The officers' search of the black pickup did not exceed the scope of the warrant and did not violate the Fourth Amendment.

III.    February 8, 2021: Consent to Interrogation and Cell Phone Search

On February 8, 2021, Deputy Briley and Investigator Parsons contacted Graham at the Otoe County jail. Graham was immediately advised of his Miranda rights. Graham stated he was willing to answer questions without a lawyer present. Questioning ensued, and during that questioning, Graham consented to the search the cell phone—both orally and in writing. Graham claims his consent to interrogation and to the search of his cell phone was coerced and involuntary. (Filing No. 133 and Filing No. 135). He argues his statements in response to interrogation, and the contents of his cell phone, must be suppressed.

The government bears the burden of proving, by a preponderance of the evidence, that Graham's consent was voluntary. United States v. Bearden, 780 F.3d 887, 895 (8th Cir. 2015) (citation omitted). The court looks at the totality of the circumstances when deciding if a defendant voluntarily cooperated with an officer's requests or, in the alternative, was coerced to do so. Id.; United States v. Saenz, 474 F.3d 1132, 1136 (8th Cir. 2007). A consent is voluntary "if it [is] 'the product of an essentially free and unconstrained choice by its maker,' rather than

14

'the product of duress or coercion, express or implied.'" United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990)(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973), internal quotations omitted. The proper inquiry "is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." United States v. Drayton, 536 U.S. 194, 202 (2002).

When determining whether a defendant's consent is voluntarily, the court considers the defendant himself: his age, intelligence and education; whether he was cooperating with police; his knowledge of his right to refuse consent; and his familiarity with arrests and the legal system. The court also considers the environment in which consent was given and the actions of the officers: whether the police treated, intimidated, punished, or falsely promised something to the defendant; whether the defendant was in custody or under arrest when consent was given and, if so, the length of that detention; and whether consent occurred in a public or secluded area. United States v. Harris, 55 F.4th 575, 581 (8th Cir. 2022).

At the outset of the interview, Graham was advised of his <u>Miranda</u> rights, appeared to understand those rights, and stated he was willing to answer questions. Graham is an adult of at least average intelligence with prior experience with the legal system. He was well-acquainted with Deputy Briley, and he appeared at ease with the interrogating officers from the outset and throughout the questioning on February 8, 2021. Neither Investigator Parsons nor Deputy Briley brandished or threatened to brandish a weapon or made promises or threats to elicit Graham's cooperation. Graham was in custody, and had been for three days, but he was familiar with a custodial environment, and he was not handcuffed during the interview. The officers approached Graham during

15

mid-morning hours. Graham appeared rested, alert, and not under the influence of drugs or alcohol. He agreed to answer questions without hesitation.

The interview lasted only an hour. Throughout the interview, Graham's answers to questioning were responsive to the questions asked, and he refused to answer some questions—indicating he did not feel coerced to cooperate. Graham's entire conversation with the officers was cordial and professional, and when asked for consent to search the cell phone, Graham again stated his consent without any hesitation. Graham never requested the presence of a lawyer during questioning.

While Graham claims he consented to questioning and the search of his phone because he was distraught over the death of King (and perhaps also over the forcible entry into his home), he never verbally or by conduct indicated as such—either at the outset or during the interrogation. The issue of whether officers may rely on a statement of consent "turns not on the defendant's subjective state of mind, but on whether the officer reasonably believed the defendant consented." United States v. Garcia-Garcia, 957 F.3d 887, 892 (8th Cir. 2020). A reasonably objective officer under the circumstances would not have believed Graham's stated consent to interrogation and consent to the search of his cell phone were the product of distress over the death of King or the damage to Graham's residence.

Graham also claims his consent to search the phone was the product of coercion because Deputy Briley stated that the officers would request a warrant if Graham refused consent. This statement was candid and truthful, not impermissibly coercive, and did not render Graham's consent involuntary. United States v. Raines, 536 F.2d 796, 801 (8th Cir. 1976) (holding an officer's

statement to the defendant that police would guard the house while they applied for a search warrant did not render defendant's consent involuntary); United States v. Osorio, No. 4:06CR3049, 2006 WL 2882496, at *6 (D. Neb. Oct. 6, 2006).

Upon consideration of the totality of the circumstances, Graham's consent to interrogation, his answers during the interrogation, and his consent to search the cell phone were knowingly and voluntarily provided, and they were not the product of coercion. The officers lawfully interrogated Graham and searched his cell phone. Graham's responsive statements and the contents of the cell phone should not be suppressed.

IV.     Motion to Dismiss Count II of the Indictment: Felon in Possession of a Firearm (Filing No. 160)

Count II of the indictment alleges:

On or about February 5, 2021, in the District of Nebraska, Defendant GARY GRAHAM, knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, to wit: Conspiracy to Manufacture and Distribute Methamphetamine, in the United States District Court for the District of Nebraska, case number 8:98CR235, knowingly possessed a Remington 522 Viper .22 caliber rifle and ammunition which had been shipped and transported in interstate commerce.

(Filing No. 1). Graham seeks dismissal of Count II, arguing "he is not prohibited from possessing a firearm, as the statutes that criminalize this alleged behavior are overbroad" and violate Defendant's Second Amendment rights. (Filing No. 161).

Graham's argument is foreclosed by the Eighth Circuit's decision in United States v. Jackson, 69 F.4th 495 (8th Cir. 2023). In Jackson, the defendant had a previous felony conviction for selling a controlled substance and was charged

with being a felon in possession of a firearm. Jackson argued the felon-in-possession statute, § 922(g)(1), is unconstitutional on its face and as applied to him. Id. at 499. The Eighth Circuit disagreed.

Citing New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. ——, 142 S. Ct. 2111, 213 L.Ed.2d 387 (2022), and District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), Jackson upheld the "longstanding prohibitions on the possession of firearms by felons." Jackson, 69 F.4th at 502. While the defendant in Jackson argued that his prior drug felony indicated no propensity for violence, and there was no showing that he was more dangerous than a typical law-abiding citizen, Jackson rejected any need for "felony-by-felony litigation regarding the constitutionality of § 922(g)(1)." Id. "[H]istory supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society." Id. at 504.

> [L]egislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons. Consistent with the Supreme Court's assurances that recent decisions on the Second Amendment cast no doubt on the constitutionality of laws prohibiting the possession of firearms by felons, we conclude that the statute is constitutional as applied to Jackson.

Jackson, 69 F.4th at 505–06.[3]

---

[3]     Jackson does not specifically state that defendant's facial challenge was rejected. But it upholds an interpretation of 18 U.S.C. § 922(g)(1) which prohibits all felons from possessing firearms, indicating § 922(g)(1) is not unconstitutional on its face.

Like the defendant in <u>Jackson</u>, Graham has a prior felony drug conviction and is charged with violating 18 U.S.C. § 922(g)(1). The statute is not unconstitutional either on its face or as applied to the charges pending against Graham.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable John M. Gerrard, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b), that Defendant Graham's motions to suppress (Filing Nos. 133 and 135), and his motion to dismiss, (Filing No. 160), be denied in their entirety.

The defendant is notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS ORDERED:

1)      The trial of this case is set to commence before the Honorable John M. Gerrard, Senior United States District Judge,  in Courtroom 1, United States Courthouse, Lincoln, Nebraska,  at 9:00 a.m. on December 11, 2023, or as soon thereafter as the case may be called, for a duration of five (5) trial days. Jury selection will be held at commencement of trial.

2)      Expert witness disclosures as required under Rule 16 must be served on or before December 1, 2023.

3)      The time between today's date and December 11, 2023 shall be deemed excludable time in any computation of time under the requirements of the Speedy Trial Act, because although counsel have been duly diligent, additional time is needed because they must now contact witnesses and prepare for trial and failing to grant additional time might result in a miscarriage of justice.  18 U.S.C. § 3161(h)(1) & (h)(7). Failing to timely object to this order as provided under this court's local rules will be deemed a waiver of any right to

later claim the time should not have been excluded under the Speedy Trial Act.

November 6, 2023.                    BY THE COURT:

                                    *s/ Cheryl R. Zwart*
                                    United States Magistrate Judge